FILED
5/27/2025 5:17 PM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | |
|---|---|
| Angel Gonzalez,<br>Plaintiff,<br>v.<br>GigNet, Inc.,<br>Defendant. | Case Number: 2025LA00000444 |

## COMPLAINT

### I. INTRODUCTION

1. When Plaintiff Angel Gonzalez ("Gonzalez" or "Plaintiff") joined Defendant GigNet, Inc. ("GigNet") as Chief Executive Officer ("CFO") in 2023, he was already an accomplished executive, with prior experience as the CFO for a multi-national corporation. Despite a deficient work environment and a leadership team seemingly focused entirely on attempting to refinance GigNet's debt structure, Gonzalez worked hard to placate unhappy lenders, suppliers, and landlords, while managing the day-to-day operations of the business. As GigNet continued to struggle with liquidity and supplier and lender management, GigNet's leadership team asked Gonzalez to take illegal actions on behalf of the business. Gonzalez refused to participate in such illegal actions, and, in retaliation, GigNet fired Gonzalez and withheld his severance in breach of his employment contract and in violation of the Illinois Wage Payment and Collection Act, the Illinois Whistleblower Protection Act, and common law.

### II. PARTIES

2. Gonzalez is a resident of Weirsdale, Florida. Defendant GigNet., Inc., employed Gonzalez from October 1, 2023, to October 17, 2024.

3. GigNet is a Delaware Corporation, with its principal place of business in Lake Bluff, Lake County, IL.

NOTICE
PURSUANT TO LCR - 2-2.14
THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE
IN COURTROOM c204 ON
8/21/25 AT 0900a A.M./P.M.
FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR
AN ORDER OF DEFAULT BEING ENTERED.

## III. JURISDICTION AND VENUE

4. The Court has jurisdiction over the Defendant pursuant to 735 ILCS 5/2-209 as the Defendant GigNet, Inc. is a corporation doing business within the state of Illinois.

5. Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because Defendant GigNet, Inc. has its principal place of business in Lake County and at least some of the actions complained of took place in Lake County.

## IV. ALLEGATIONS

6. GigNet hired Gonzalez as the CFO on October 1, 2023.

7. Gonzalez moved from Puerto Rico to Cancun, Mexico, to start the role.

8. Gonzalez's employment was governed by an Employment Agreement, attached hereto as Exhibit A.

9. In that role, Gonzolez was tasked with providing administrative, financial and other executive and managerial services to the Company. His responsibilities included "overall corporate finance leadership in the USA and Mexico; direct management of Mexico finance and reporting for all Mexico subsidiaries; consolidation of USA and Mexico financial statements, monthly, quarterly, annually; support for all investment offerings and M&A activities; budget and modeling support; tax filings Mexico and USA; other tasks and projects as defined by the" Chief Executive Officer, to whom Gonzalez reported. (Ex. A, Employment Agreement ¶ 2(c).)

10. Immediately, Gonzalez encountered a deficient work environment at GigNet, with, among other things, no formal performance reviews or results monitoring processes in place.

11. Gonzalez learned that the sole focus of leadership, specifically Chief Executive Officer and Chairman Paul Moore ("Moore") and Chief Administrative Officer and Secretary of the Board Edward Mooney ("Mooney"), was to refinance GigNet's debt.

12. Initially, Mooney and Moore only communicated with Gonzalez about new

investors and otherwise left Gonzalez to deal with day-to-day operations, including conversations with unhappy lenders, landlords, and suppliers about GigNet's payment issues.

13. In early 2024, liquidity constraints and challenges maintaining suppliers and lenders continued as GigNet lost credibility in the market.

14. Moore continued to prioritize investor conversations over day-to-day business, despite the on-going liquidity issues. On the rare occasions when Moore contacted Gonzalez, he primarily relayed information through VP of Business Development Christopher Spinnler ("Spinnler") or infrequently through WhatsApp message.

15. On January 26, 2023, Gonzalez recommended to Moore and the Board of Directors that GigNet should consolidate audit and tax services to one vender and undergo a full audit.

16. Starting on or around June 2024, Gonzalez started to receive communications from Moore and Mooney regarding the liquidity issue. Some communications were from Moore and Mooney directly, while others came from Spinnler or VP of Operations Carlos Carranza ("Carranza").

17. Moore and Mooney began cutting Gonzalez out of finance-related conversations despite Gonzalez's CFO role and the Employment Agreement, and allowed Spinnler and Carranza to make financial decisions, making Gonzalez's work more complex.

18. In August 2024, GigNet's external auditors felt compelled to withdraw due to "significant differences with management" on the treatment of certain transactions. Gonzalez explained to Moore and Mooney that he "aligned with the feedback" that was provided by the auditor. He recommended addressing the auditors concerns before hiring another audit firm.

19. In October, Moore and Mooney asked Gonzalez to outsource resources to a third-party firm in Mexico, a concept referred to as a "pagadora." Gonzalez expressed his concerns about this directive as he believed it was illegal and the Company could be subject to penalties if not

properly structured and managed. On October 11, 2024, Gonzalez even sent Moore and Mooney an article about recent legal reforms in Mexico he believed the plan would violate. Accordingly, Gonzalez refused to participate.

20. Moore and Mooney also instructed Gonzalez to transfer billing and collections activities of GigNet's main operational entity to the same third-party firm. This transfer would be in violation of GigNet's debt agreements and would require communication with GigNet's main lender. Accordingly, Gonzalez refused to participate.

21. After Gonzalez began expressing concerns over the legality of these requested activities, Moore and Mooney started responding to Gonzalez emails accusing Gonzalez of an unprofessional communications tone.

22. Just one week after Gonzalez sent a formal refusal to participate in the illegal activities, Moore and Mooney flew to Mexico and fired Gonzalez. They claimed this was a "for cause" termination. When Gonzalez asked Mr. Mooney what the "cause" was for the termination, Mr. Mooney said it was because Gonzalez "wasn't a good fit."

23. As a direct and proximate result of the misconduct herein described, Plaintiff lost his employment and benefits as an employee of GigNet, and suffered the embarrassment, humiliation, and stigma associated with the termination.

24. As a result of Gonzalez's termination, Gonzalez's reputation in the community has been diminished.

## COUNT I

## BREACH OF CONTRACT

21. Gonzalez restates and incorporates the above paragraphs of this Complaint as if fully set forth herein.

22. GigNet offered Gonzalez employment as described in definite and certain terms in

Exhibit A ("Employment Agreement") and incorporated herein.

23. Under the Employment Agreement, GigNet would compensate Gonzalez for his work as CFO with a set Salary (which would increase upon the closing of major financing), an Annual Bonus, a Signing Bonus, Equity, Medical Benefits, Other Benefits, and Business Expense reimbursement, as defined therein. (Ex. A, Employment Agreement ¶ 3.)

24. The Employment Agreement provided for a three-year initial term, renewing automatically unless a party provided 30-days notice of its intent not to renew or if GigNet terminated Gonzalez as permitted under the agreement. (Ex. A, Employment Agreement ¶ 4(a).)

25. The effect of such a termination depending on whether there was "cause" for such a termination:

> (c) If Executive's employment hereunder is terminated by the Company for Cause during the Employment Period, then Executive shall be entitled to receive only Executive's accrued, unpaid Salary, and for the year during which Executive's employment hereunder is terminated, accrued but unused vacation time through the effective date of Executive's termination of employment (the "Termination Date"), any reimbursements owed for business expenses validly incurred on or prior to the Termination Date and reimbursable in accordance with Section 3(g) and any accrued but unpaid benefits due and owing to Executive under the Benefit Plans (the "Accrued Obligations").
>
> (d) If Executive's employment hereunder is terminated without Cause by the Company during the Employment Period, then Executive shall be entitled to receive the Accrued Obligations and, provided Executive signs and does not revoke a general release of claims against the Company and its affiliates on a form to be provided by the Company within 14 days of the Termination Date, and subject to Executive's compliance with each obligation pursuant to Section 5, Section 6 and Section 7, Executive shall also be entitled to receive 1 (one) year of Annual Base Salary, payable in twelve equal installments over the twelve months following the Termination Date.

26. GigNet defined "Cause" in the agreement:

> (f) For purposes of the Agreement, "Cause" shall mean Executive's (i) indictment or conviction of or entering a guilty plea or plea of no contest to any felony or any crime involving moral turpitude, dishonesty, fraud, misrepresentation, embezzlement, theft or sexual harassment, (ii) failure to perform the duties required of Executive by this Agreement, (iii) breach of this Agreement (or any other agreement entered into between Executive and the Company), (iv) dishonesty, fraud or misconduct with respect to the business or affairs of the Company or its affiliates, or any act of embezzlement or other misappropriation, (v) participation in any fraud or dishonesty against or affecting the

Company or any subsidiary, affiliate, customer, supplier, client, agent, or employee thereof, (vi) breach of any fiduciary or similar duty owed to the Company or its affiliates, (vii) refusal to carry out the legitimate directives or instructions of the Board (or such other person to whom Executive reports as may be designated from time to time by the Board), or (viii) other act that the Company reasonably determines constitutes misconduct materially detrimental to the Company or any subsidiary, affiliate, customer, supplier, client, agent, or employee thereof, including, but not limited to, unethical practices, dishonesty, disloyalty, or any other acts harmful to the Company.

27. Gonzalez accepted that offer and signed the Employment Agreement on or about October 1, 2023.

28. In consideration for the Employment Agreement, Gonzalez began to perform under the Employment Agreement in exchange for compensation.

29. Gonzalez performed all required contractual conditions under the Employment Agreement.

30. GigNet terminated Gonzalez on October 17, 2024, without "Cause" as defined in the Employment Agreement. (Ex. Employment Agreement ¶ 4(f).)

31. GigNet failed to pay Gonzalez severance as required under Paragraph 4(d) of the Employment Agreement.

32. GigNet failed to pay Gonzalez expenses related to a vehicle Gignet required Gonzalez to purchase under the Employment Agreement and Illinois law. (Ex. A, Employment Agreement ¶ 3(f).)

33. GigNet failed to pay Gonzalez a signing bonus of $75,000 cash (plus the 5% monthly interest for nonpayment) and $25,000 in shares of common stock. (Ex. A, Employment Agreement ¶ 3(c).)

34. GigNet failed to pay Gonzalez vested equity of $40,000 per quarter employed. (Ex. A, Employment Agreement ¶ 3(d).)

35. GigNet failed to pay for or terminate Gonzalez's health insurance until December, resulting in a $2,700 payment owed to Triple S. (Ex. A, Employment Agreement ¶ 3(e).)

36. As a direct and proximate result of these breaches, Gonzalez has suffered damages, as described above.

**COUNT II**

**ILLINOIS WAGE ACT VIOLATION**

42. Gonzalez restates and incorporates the above paragraphs of this Complaint as if fully set forth herein.

43. The Wage Act requires Illinois employers to pay their employees according to their agreements and to pay employees all earned wages or final compensation, including "any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2.

44. GigNet was Gonzalez's employer, and Gonzalez was GigNet's employee, as defined under the Wage Act. 820 ILCS 115/1-2.

45. GigNet failed to pay Gonzalez severance compensation as required under the Employment Agreement. (Ex. A, Employment Agreement ¶ 4(d).)

37. GigNet failed to pay Gonzalez expenses related to a vehicle GigNet required Gonzalez purchase for his work with the company. (Ex. A, Employment Agreement ¶ 3(f).)

38. GigNet failed to pay Gonzalez a signing bonus of $75,000 cash (plus the 5% monthly interest for nonpayment) and $25,000 in shares of common stock. (Ex. A, Employment Agreement ¶ 3(c).)

39. GigNet failed to pay Gonzalez vested equity of $40,000 per quarter employed. (Ex. A, Employment Agreement ¶ 3(d).)

40. By refusing to pay Gonzalez earned compensation owed under their agreements, GigNet denied Gonzalez final compensation to which he was lawfully entitled.

41. GigNet refused to pay Gonzalez his due and owing compensation even after

Gonzalez requested they do so, necessitating this Action.

42. GigNet's violation of the Wage Act was willful.

43. On information and belief, GigNet failed to pay its prior CFO Zeljko Kecman earned compensation upon his termination.

44. As a direct result of the GigNet's violation of the Wage Act, Gonzalez has suffered damages in the form of lost earned compensation.

**COUNT III**

**ILLINOIS WHISTLEBLOWER PROTECTION ACT**

45. Gonzalez realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

46. Gonzalez was an employee of Defendant, and Defendant was his employer as defined by the Act. 740 ILCS 174/5.

47. Defendant tasked Gonzalez with the outsourcing of GigNet's Mexican resources to a third party in Mexico that he believed in good faith would violate law.

48. Gonzalez refused to participate in what he believed to be a violation of the law, including what is known as personnel subcontracting, prohibited under the Decree amending, adding to and repealing various provisions of the Federal Labor Law; the Social Security Law; the Law of the National Workers' Housing Fund Institute; the Federal Tax Code; the Income Tax Law; the Value Added Tax Law; the Federal Law of Workers in the Service of the State, Regulatory of Section B) of Article 123 of the Constitution; the Regulatory Law of Section XIII Bis of Section B, of Article 123 of the Political Constitution of the United Mexican States, regarding Labor Subcontracting published April 23, 2021, *available at* https://dof.gob.mx/nota_detalle.php?codigo=5616745&fecha=23/04/2021#gsc.tab=0

49. GigNet retaliated against Gonzalez for his refusal to participate in what he believed

was a violation of law, including by firing Gonzalez.

50. Gonzalez has suffered damages as a result of GigNet's unlawful actions.

**COUNT IV**

**RETALIATORY DISCHARGE AT COMMON LAW**

51. Gonzalez realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

52. "A discharged employee may sue [his] employer for the common law tort of retaliatory discharge if [his] discharge was in retaliation for certain actions that are protected by the public policy of Illinois, including retaliation for complaints about an employer's unlawful conduct." *Brandon v. Anesthesia & Pain Mgt. Associates, Ltd.*, 277 F.3d 936, 940–41 (7th Cir. 2002).

53. Gonzalez complained about what he believed in good faith to be GigNet's unlawful conduct.

54. GigNet terminated Gonzalez for his refusal to participate in what he believed was a violation of the law.

55. Gonzalez has suffered damages as a result of GigNet's unlawful actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Enter a judgment in his favor and against Defendant;

2. Order Plaintiff's reinstatement with full seniority and benefits, retroactive to the date of Plaintiff's discharge;

3. Award Plaintiff make whole relief, including: (1) back pay and all benefits; (2) compensatory damages for his humiliation and mental and emotional distress; (3) punitive damages against the individual defendants; (4) interest on compensatory damages at a rate set by

law; and (5) costs and attorney's fees;

4. Statutory damages for the Wage Act violations, calculated at "5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid;" 820 ILCS 105/12(a); and

5. Grant Plaintiff such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

**ANGEL GONZALEZ**

By: */s/ Gail S. Eisenberg*
One of His Attorneys

Gail S. Eisenberg
LOFTUS & EISENBERG, LTD.
181 W. Madison, Suite 4700
Chicago, Illinois 60602
T: 312.899.6625
Gail@loftusandeisenberg.com
ARDC No. 6308951

Dated: May 27, 2025

# Exhibit A

# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (this "Agreement") is entered into as of October 1, 2023 (the "Effective Date") by and between Angel Gonzalez, an individual resident of Puerto Rico ("Executive"), and GigNet, Inc., a Delaware corporation. (the "Company").

**WHEREAS**, the Company wishes to employ Executive in accordance with the terms of this Agreement.

**WHEREAS**, Executive wishes to accept employment with the Company according to the terms of this Agreement; and

**WHEREAS**, this Agreement shall replace and supersede in its entirety any prior employment agreements, offer letters, or understandings between Executive and the Company (the "Prior Agreement").

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

**1.** **Employment**. The Company hereby employs Executive, and Executive hereby accepts employment by the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date and ending on the date described in Section 4(a) (the "Employment Period").

**2.** **Position and Duties**.

(a) During the Employment Period, Executive shall serve as the Chief Financial Officer of the Company, and in connection therewith Executive shall render such administrative, financial and other executive and managerial services to the Company and have the responsibilities and authority which are consistent with Executive's position, subject to the power and authority of the Board of Directors of the Company (the "Board") to expand or limit such duties, responsibilities, functions and authority.

(b) Executive shall report directly to the CEO (or such other person as shall be designated by the CEO or the Board, and indirectly to the Chief Administrative Officer and any Board Committees such as Audit or Compensation). Executive shall perform Executive's duties and responsibilities to the best of Executive's abilities in a diligent, trustworthy, businesslike and efficient manner. Executive shall devote Executive's full business time, energies and attention (except for permitted vacation periods and periods of illness or other temporary incapacity) to the business and affairs of the Company. So long as Executive is employed by the Company, Executive shall not, without the prior written consent of the Board, accept other employment or perform other services for compensation or that interfere with Executive's employment with the Company; provided, however, that Executive may serve as an officer or director of or otherwise participate in purely educational, welfare, social, religious and civic organizations so long as such activities are not in competition with the Company or do not interfere with Executive's ability to carry out Executive's duties under this Agreement.

( c) Responsibilities shall include Overall corporate finance leadership in the USA and Mexico; direct management of Mexico finance and reporting for all Mexico subsidiaries; consolidation of USA and Mexico financial statements, monthly, quarterly, annually; support for all investment offerings and M&A activities; budget and modeling support; tax filings Mexico and USA; other tasks and projects as defined by the CEO.

(d) Executive shall comply with all lawful rules, policies, procedures, regulations and administrative directions now or hereafter reasonably established by the Board for employees of the Company, including compliance with and annual certification for United States Foreign Corrupt Practices Act purposes and Company policies and procedures in the USA and Mexico.

**3. Salary and Benefits**.

(a) Salary. During the Employment Period, the Company shall pay Executive a base salary at the annual rate of $240,000 ($20,000 per month), payable in regular installments in accordance with the Company's usual payment practices subject to required withholdings and taxes (the "Salary"). Executive may receive increases in Executive's Salary to the extent such an increase is approved in the sole discretion of the Board. Upon the Closing of the Company's Major Financing anticipated during 2024, the Base Monthly Salary shall increase to US$25,000 per month.

(b) Annual Bonus. With respect to each calendar year during the Employment Period, Executive may be eligible to receive an annual bonus up to 100% of the Annual Base Salary, based on criteria to be determined by the CEO, Board, and agreed by the Executive, payable 50% in Cash and 50% in Equity.

(c) Signing Bonus. Executive shall receive as a signing bonus 25,000 shares of restricted Common Stock issued immediately, and a cash payment of $75,000 payable upon the Closing of the Major Financing, or paid in part or in full from other financing efforts of the Company consistent with other working capital needs of the Company.

(d) Equity. Executive will be granted 40,000 shares of restricted stock per quarter (with 24-month vesting for each Grant); accelerated vesting in case of a sale of the Company prior to 3-years. For avoidance of doubt, shares to be issued during the Term of this Agreement equates to 480,000 shares that would immediately vest in the event of a sale closing from November 1st, 2023 and up to October 31th, 2026. Executive will be eligible for a stock bonus of 200,000 shares upon the Company successfully closing a Major Financing with gross proceeds of at least US$50 million.

(e) Medical Benefits. During the Employment Period, Executive shall be entitled to paid vacation, paid holidays and to participate in all employee health benefit plans of the Company, including without limitation all health insurance plans, consistent with the Company's then-current practice as approved by the Board from time to time. Specifically, a family international covered medical plan will be provided or reimbursed, to cover two dependents who will continue to live in USA and 1 dependent and spouse that will live with Executive in Mexico. The foregoing shall not be construed to require the Company to establish such Benefit Plans or to prevent the modification or termination of such Benefit Plans once established, and no such action or failure thereof shall affect this Agreement. Executive recognizes that the Company and its affiliates have the right, in their sole discretion, to amend, modify or terminate any Benefit Plans without creating any rights in Executive.

(f) Other Benefits. Housing - Executive will be entitled to a Corporate Apartment in the Cancun Region, either paid by the Company or reimbursed to the Executive. Travel – up to Eight included trips or allowance for trips from Cancun to Puerto Rico per year for one passenger. Executive will cover any travel cost for family members. Access to a Company car (driver if consistent with current company practices), or reimbursement for a car purchase, rental, and/or lease.

(g) Business Expenses. During the Employment Period, the Company shall reimburse Executive for all reasonable business expenses incurred by Executive in the course of performing Executive's duties under this Agreement; provided such expenses are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses. As a condition to being issued such reimbursements, Executive shall submit to the Company on a timely basis business expense reports, including substantiation in accordance with the Company's policy as in effect from time to time. For purposes of compliance with Code Section 409A (as defined in Section 25): (i) all expenses or other reimbursements under this Agreement shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Executive, (ii) any such right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit and (iii) no such reimbursement, expenses eligible for reimbursement or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

**4. Employment Period.**

(a) The Employment Period shall begin on the Effective Date and shall continue for 3 years, and shall thereafter automatically renew for one year terms unless either party gives the other party 30 days' notice of its election not to renew, or until Executive's employment hereunder is terminated in accordance with Section 4(b).

(b) The Employment Period and Executive's employment hereunder (i) shall terminate upon Executive's death or permanent disability or incapacity, and (ii) may be terminated by the Company at any time with or without Cause (as defined in Section 4(f)).

(c) If Executive's employment hereunder is terminated by the Company for Cause during the Employment Period, then Executive shall be entitled to receive only Executive's accrued, unpaid Salary, and for the year during which Executive's employment hereunder is terminated, accrued but unused vacation time through the effective date of Executive's termination of employment (the "Termination Date"), any reimbursements owed for business expenses validly incurred on or prior to the Termination Date and reimbursable in accordance with Section 3(g) and any accrued but unpaid benefits due and owing to Executive under the Benefit Plans (the "Accrued Obligations").

(d) If Executive's employment hereunder is terminated without Cause by the Company during the Employment Period, then Executive shall be entitled to receive the Accrued Obligations and, provided Executive signs and does not revoke a general release of claims against the Company and its affiliates on a form to be provided by the Company within 14 days of the Termination Date, and subject to Executive's compliance with each obligation pursuant to Section 5, Section 6 and Section 7, Executive shall also be entitled to receive 1 (one) year of Annual Base Salary, payable in twelve equal installments over the twelve months following the Termination Date.

(e) If Executive's employment hereunder is terminated as a result of Executive's death, permanent disability or incapacity during the Employment Period, Executive or Executive's representatives or beneficiaries shall be entitled to receive the Accrued Obligations and any rights to continuation of coverage and to benefits under any Benefit Plans required under applicable law, plus six months of Base Salary paid over the six months following the Executive's death, permanent disability, or incapacity.

(f) For purposes of the Agreement, "Cause" shall mean Executive's (i) indictment or conviction of or entering a guilty plea or plea of no contest to any felony or any crime involving moral turpitude, dishonesty, fraud, misrepresentation, embezzlement, theft or sexual harassment, (ii) failure to perform the duties required of Executive by this Agreement, (iii) breach of this Agreement (or any other agreement entered into between Executive and the Company), (iv) dishonesty, fraud or misconduct with

respect to the business or affairs of the Company or its affiliates, or any act of embezzlement or other misappropriation, (v) participation in any fraud or dishonesty against or affecting the Company or any subsidiary, affiliate, customer, supplier, client, agent, or employee thereof, (vi) breach of any fiduciary or similar duty owed to the Company or its affiliates, (vii) refusal to carry out the legitimate directives or instructions of the Board (or such other person to whom Executive reports as may be designated from time to time by the Board), or (viii) other act that the Company reasonably determines constitutes misconduct materially detrimental to the Company or any subsidiary, affiliate, customer, supplier, client, agent, or employee thereof, including, but not limited to, unethical practices, dishonesty, disloyalty, or any other acts harmful to the Company.

(g) For purposes of this Agreement, Executive's permanent disability or incapacity shall be determined in accordance with the Company's long-term disability insurance policy, if such a policy is then in effect, or, if no such policy is then in effect, then such permanent disability or incapacity shall be deemed to have occurred upon Executive's inability to perform the essential functions of the position set forth in Section 2(a), after reasonable accommodation by the Company, for a period of at least 180 days, in the aggregate, during any period of 365 calendar days, unless further time is required as a reasonable accommodation under the Americans with Disabilities Act.

**5. Restrictive Covenants.**

(a) Noncompetition Covenant. During the period commencing on the Effective Date and terminating on the first anniversary of the Termination Date (the "Restricted Period"), Executive shall not directly or indirectly (whether for compensation or without compensation), as principal, agent, owner, partner, employee, consultant, shareholder, member, director, manager or officer, as the case may be, or otherwise howsoever, own, operate, be engaged in or connected with the operation of or have any financial interest in or advance, lend money to, guarantee the debts or obligations of or permit Executive's name or part thereof to be used or employed in any operation, whether a proprietorship, partnership, joint venture, company or other entity, legal or otherwise, whatsoever, or otherwise carry on or engage in any activity or business similar to the Company's business or be connected or involved in any manner whatsoever in any activity or business similar to the Company's business in whole or in part; provided, however, that such restrictions shall not preclude Executive from owning up to 1% of the totally outstanding stock of a publicly traded entity.

(b) Non-solicitation Covenant. During the Restricted Period, Executive shall not, directly or indirectly (whether for compensation or without compensation), as principal, agent, owner, partner, employee, consultant, shareholder, member, director, manager or officer, as the case may be (other than as the holder of an ownership interest of not more than 1% of the total outstanding stock of a publicly traded entity):

(i) solicit, or attempt to obtain business from, accept business from or contact any current or former customer of the Company regarding activity or business similar to the Company's activities or business in whole or in part; or

(ii) induce or attempt to induce any Company employee to terminate employment with the Company, hire or participate in the hiring of any Company employee or independent contractor, or interfere with or attempt to disrupt the relationship, contractual or otherwise, between the Company and any Company employee or independent contractor. For purposes of this paragraph, a Company employee or independent contractor means any person employed or contracted by the Company during the Employment Period.

**6. Confidentiality.**

(a) Executive will not at any time (whether during or after Executive's employment with the Company) (x) retain or use for the benefit, purposes or account of Executive or any other person; or (y) disclose, divulge, reveal, communicate, share, transfer or provide access to any person outside the Company (other than its professional advisers who are bound by confidentiality obligations), any non-public, proprietary or confidential information – including without limitation trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals – concerning the past, current or future business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis ("Confidential Information") without the prior written authorization of the Board; provided, that Executive may disclose such information to Executive's legal and/or financial advisor for the limited purpose of enforcing Executive's rights under this Agreement so long as Executive requires that such legal and/or financial advisors not disclose such information and Executive shall be liable for any disclosure by such legal and/or financial advisors.

(b) Confidential Information shall not include any information that is: (i) generally known to the industry or the public other than as a result of Executive's breach of this covenant or any breach of other confidentiality obligations by third parties; (ii) made legitimately available to Executive by a third party without breach of any confidentiality obligation; or (iii) required by applicable law to be disclosed; provided that Executive shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and cooperate with any attempts by the Company to obtain a protective order or similar treatment.

(c) Executive acknowledges, agrees, and understands that (1) nothing in this Agreement prohibits Executive from reporting to any governmental authority or attorney information concerning suspected violations of law or regulation, provided that Executive does so consistent with 18 U.S.C. 1833, and (2) Executive may disclose trade secret information to a government official or to an attorney and use it in certain court proceedings without fear of prosecution or liability, provided that Executive does so consistent with 18 U.S.C. 1833.

(d) Executive acknowledges, agrees, and understands that nothing in this Agreement prospectively restrains Executive from disclosing the existence or occurrence of a sexual harassment dispute or sexual assault dispute as defined by The Speak Out Act, Pub. L. No. 117-224.

(e) Executive understands that certain whistleblower laws permit Executive to communicate directly with governmental or regulatory authorities, including communications with the U.S. Securities and Exchange Commission about possible securities law violations. Executive acknowledges that he is not required to seek the Company's permission or notify the Company of any communications made in compliance with applicable whistleblower laws, and that the Company will not consider such communications to violate this or any other agreement between Executive and the Company or any Company policy by which Executive is bound.

(f) Except as required by applicable law, Executive will not disclose to anyone, other than Executive's spouse, legal or financial advisors or members of the Company's senior management, the existence or contents of this Agreement.

(g) Upon termination of Executive's employment with the Company for any reason, Executive shall: (x) cease and not thereafter commence use of any Confidential Information or intellectual property (including, without limitation, any patent, invention, copyright, trade secret, trademark, trade

name, logo, domain name or other source indicator) owned or used by the Company, its subsidiaries or affiliates; (y) immediately return to the Company, at the Company's option, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in Executive's possession or control (including any of the foregoing stored or located in Executive's office, home, laptop or other computer, whether or not Company property) that contain Confidential Information or otherwise relate to the business of the Company, its affiliates and subsidiaries, except that Executive may retain only those portions of any personal notes, notebooks and diaries that do not contain any Confidential Information or are not related to the Company's business; and (z) notify and fully cooperate with the Company regarding the delivery of any other Confidential Information of which Executive is or becomes aware.

**7. Intellectual Property**.

(a) If Executive has created, invented, designed, developed, contributed to or improved any works of authorship, inventions, intellectual property, materials, documents or other work product (including, without limitation, research, reports, software, databases, systems, applications, presentations, textual works, content or audiovisual materials) ("Works"), either alone or with third parties, prior to Executive's employment by the Company, that are relevant to or implicated by such employment ("Prior Works"), Executive hereby grants the Company a perpetual, non-exclusive, royalty-free, worldwide, assignable, sub-licensable license under all rights and intellectual property rights (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) therein for all purposes in connection with the Company's current and future business. Executive shall provide the Company with a list of all Prior Works within 15 days of the Effective Date.

(b) If Executive creates, invents, designs, develops, contributes to or improves any Works, either alone or with third parties, at any time during Executive's employment by the Company and within the scope of such employment and/or with the use of any Company resources ("Company Works"), Executive shall promptly and fully disclose the same to the Company and hereby irrevocably assigns, transfers and conveys, to the maximum extent permitted by applicable law, all rights and intellectual property rights therein (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) to the Company to the extent ownership of any such rights does not vest originally in the Company.

(c) Executive agrees to keep and maintain adequate and current written records (in the form of notes, sketches, drawings and any other form or media requested by the Company) of all Company Works. The records will be available to and remain the sole property and intellectual property of the Company at all times.

(d) Executive shall take all requested actions and execute all requested documents (including any licenses or assignments required by a government contract) at the Company's expense (but without further remuneration) to assist the Company in validating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of the Company's rights in the Prior Works and Company Works. If the Company is unable for any other reason to secure Executive's signature on any document for this purpose, then Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, to act for and in Executive's behalf and stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(e) Executive shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party without prior written permission of such third party. Executive shall comply with all

relevant policies and guidelines of the Company regarding the protection of confidential information and intellectual property and potential conflicts of interest. Executive acknowledges that the Company may amend any such policies and guidelines from time to time, and that Executive remains at all times bound by their most current version that has been communicated to Executive.

**8.** **<u>Return of Company Property</u>**. At the termination of the Employment Period and at any other time upon the request of the Company, Executive shall deliver to the Company any and all of the Company's documents, plans, records, computer tapes, software, drawings, notes, memoranda, specifications, devices (including, without limitation, any cellular phone or computer), and formulas relating to the Company's business, together with all copies thereof, which is in the possession of Executive.

**9.** **<u>Enforcement</u>**. If, at the time of enforcement of Section 5, Section 6 or Section 7, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. It is specifically understood and agreed that any breach of the provisions of Section 5, Section 6 or Section 7 are likely to result in irreparable injury to the Company and the parties hereto agree that money damages would be an inadequate remedy for any breach of Section 5, Section 6 or Section 7. Therefore, in the event of a breach or threatened breach of Section 5, Section 6 or Section 7, the Company or its successors or assigns shall, in addition to other rights and remedies existing in their favor, be entitled to specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, Section 5, Section 6 or Section 7.

**10.** **<u>Representations and Warranties</u>**.

(a) Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which Executive is bound, (ii) Executive is not a party to or bound by any employment agreement, non-solicitation agreement, assignment of inventions or confidentiality agreement with any other person or entity, (iii) Executive is not subject to any noncompetition agreement or any other agreement or restriction of any kind that would impede in any way the ability of Executive to carry out fully all activities of Executive in furtherance of the business of the Company, (iv) Executive is not in violation of a confidentiality, non-solicitation or non-competition agreement or any other agreement relating to the relationship of Executive with any third party, because of the nature of the business conducted by the Company, and (v) upon execution and delivery of this Agreement, this Agreement shall be the valid and binding obligation of Executive, enforceable against Executive in accordance with its terms, and shall replace and supersede in its entirety any Prior Agreement.

(b) The Company hereby represents and warrants to Executive that (i) the execution, delivery and performance of this Agreement by the Company does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Company is a party or by which the Company is bound and (ii) upon execution and delivery, this Agreement shall be the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

**11.** **<u>Indemnification</u>**. With respect to all actions taken by Executive during the Employment Period, the Company agrees to indemnify and defend Executive to the fullest extent permitted by applicable law in accordance with the Company's bylaws on the same basis as other officers of the Company in connection with any actions, suits or proceedings to which Executive is, or is threatened to be made, a party solely by reason of the fact that Executive is or was an officer of the Company.

**12.** **<u>Successors and Assigns</u>**. This Agreement shall bind and inure to the benefit of and be enforceable by Executive and the Company and their respective heirs, successors and permitted assigns.

Neither party may assign any of its rights or assign or delegate any of its obligations hereunder without the prior written consent of the other party hereto; provided, however, that the Company shall be permitted to assign this Agreement to any successor to all or substantially all of its assets that agrees in writing to assume all of the Company's obligations hereunder.

**13. Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from such courier, (c) on the date sent by facsimile or e-mail transmission (with acknowledgement of complete transmission), or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Notices, demands or communications to any party hereto will, unless another address is specified in writing pursuant to this Section 13, be sent to the addresses indicated below.

If to Executive:

[_____]
[_____]
[_____]
Email: [_____]

If to the Company:

GigNet Inc
101 Waukegan Road, Suite 650 Lake Bluff, Illinois 60044 USA
Attn: Edward Mooney
Email: emooney@gignetinc.com

**14. Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be valid under applicable law; but, if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but except as otherwise set forth in this Agreement, this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

**15. Complete Agreement**. This Agreement embodies the complete agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way, including without limitation, any Prior Agreement.

**16. Signatures; Counterparts**. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. For purposes hereof, a facsimile signature, portable document format (.pdf) signature or signature sent by electronic transmission will be considered an original signature.

**17. Governing Law**. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Illinois) or any other jurisdiction).

**18. Survival**. The provisions of Section 5, Section 6, Section 7, Section 8, Section 9, Section 11, Section 12, Section 13, Section 14, Section 15, Section 17, this Section 18, Section 21, Section 22, Section 23, Section 25, Section 26, and Section 28 shall survive the termination of Executive's employment and the termination of this Agreement for any reason.

**19. Tax Withholdings**. The Company shall deduct or withhold from any amounts owing from the Company to Executive any federal, state, local or foreign withholding taxes, excise tax, or employment taxes imposed with respect to Executive's compensation or other payments from the Company or

Executive's ownership interest in the Company, if any (including, without limitation, wages, bonuses, dividends, the receipt or exercise of equity options and/or the receipt or vesting of restricted equity).

**20.** **<u>Other Tax Matters</u>.** If Mexico requires over 50% of the Executive's time and impacts Executive's after-tax compensation, then a tax equalization clause is agreed to by the Company in principle, but if cost to Company greater than $40,000, the Company and Executive will cooperate to resolve to mutual satisfaction. If under 50% time in Mexico, (i.e. 5 months and 29 days in Mexico), then the Executive is not expected to incur double taxation issues and thus the tax equalization doesn't apply. In any case, the Company will cooperate as much as possible to minimize any double taxation, and Company is flexible how and where income is paid.

**21.** **<u>Waiver of Jury Trial</u>**. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

**22.** **<u>Headings; No Strict Construction</u>**. The headings of the paragraphs and sections of this Agreement are inserted for convenience only and shall not be deemed a part of or affect the construction or interpretation of any provision hereof. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

**23.** **<u>Executive's Cooperation</u>**. During the Employment Period and thereafter, Executive shall, subject to the Company reimbursing Executive for out-of-pocket expenses, cooperate with the Company in any internal investigation or administrative, regulatory or judicial proceeding as reasonably requested by the Company (including, without limitation, Executive being available to the Company upon reasonable notice for interviews and factual investigations, appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into Executive's possession, all at times and on schedules that are reasonably consistent with Executive's other permitted activities and commitments).

**24.** **<u>Corporate Opportunity</u>**. During the Employment Period, Executive shall submit to the Board all business, commercial and investment opportunities or offers presented to Executive or of which Executive becomes aware which relate to the business of the Company at any time during the Employment Period ("<u>Corporate Opportunities</u>"). Unless approved by the Board, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf.

**25.** **<u>Section 409A Compliance</u>**. The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively, "<u>Code Section 409A</u>") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company of the applicable provision without violating the provisions of Code Section 409A. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on Executive by Code Section 409A or damages for failing to comply with Code Section 409A. Notwithstanding anything herein to the contrary, a termination of employment shall be deemed to have occurred at the time such termination constitutes a "separation from service" within the meaning of Code Section 409A for purposes of any provision of this Agreement

providing for the payment of any amounts or benefits in connection with a termination of employment and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean a "separation from service." Notwithstanding any other provision to the contrary, in no event shall any payment under this Agreement that constitutes "deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

**26.** **Amendment and Waiver**. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

**27.** **Key Person Insurance**. The Company and its affiliates shall have the right throughout the term of this Agreement to obtain or increase insurance on Executive's life in such amount as the Board or such affiliate (as applicable) determines, in the name of the Company or such affiliates, as the case may be, and for its sole benefit or otherwise. Upon reasonable advance notice, Executive will cooperate in any and all necessary physical examinations without expense to Executive, supply information and sign documents and otherwise cooperate fully with each of the Company and its affiliates as the Company and its affiliates may request.

**28.** **Read and Understood**. Executive has read this Agreement carefully and understands each of its terms and conditions. Executive has sought independent legal counsel of Executive's choice to the extent Executive deemed such advice necessary in connection with the review and execution of this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

The Company:

**GigNet Inc.**



By: ______________________________________

Name: Edward Mooney

Title: Secretary and Chief Administrative Officer

Date: October 1, 2023

Executive:

Angel Gonzalez

**FILED**
**5/27/2025 5:17 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

Angel Gonzalez
Plaintiff(s)

vs.

GigNet, Inc.,
Defendant(s)

Gen No: 2025LA00000444

AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222 (B)

Pursuant to Supreme Court Rule 222 (B), counsel for the above-named plaintiff certifies that plaintiff seeks money damages in excess of Fifty Thousand and 00/100 Dollars ($50,000).

By

Loftus and Eisenberg, Ltd.
Attorneys for Plaintiff

Prepared by:
Name: Gail S. Eisenberg Pro Se ☐
Address: 181 W. Madison, Suite 4700 Chicago, IL
City: Chicago State: IL
Phone: 312.899.6625 Zip Code: 60602
ARDC #: 6308951
Fax:
E-mail address: Gail@LoftusandEisenberg.com

# SUMMONS

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**

*Check if this is not the 1st* Summons *issued for this Defendant/Respondent.*

**COUNTY:** Lake
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Angel Gonzalez
*Who started the case.* *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** GigNet, Inc.
*Who the case was filed against.*
______
______
*First, Middle, and Last Name or Business Name*

2025 LA 444
**Case Number**

**The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.**

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/summons-instructions.

Check 1 if this is a 30-day summons, or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.
- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

## ☑ 1. 30-DAY SUMMONS

To participate in this case, you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: 18 N County St, Waukegan, IL 60085
*Courthouse Street Address*

**- or -**

## ☐ 2. DATE CERTAIN SUMMONS

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/CircuitClerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

______ at ______ ☐ a.m. ☐ p.m. in ______.
*Month, Day, Year* *Time* *Courtroom Number*

*Case Number:* 2025 LA 444

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person** at: ______________________________
*Courtroom Address* *Courtroom Number*

☐ **Remotely** (video or telephone)

**By video conference** at: ______________________________
*Video Conference Website*

Log-in information: ______________________________
*Video Conference Log-in Information, Meeting ID, Password, etc.*

**By telephone** at: ______________________________
*Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

Phone: ____________________ or Website: ______________________________
*Circuit Clerk's Phone Number* *Website URL*

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ 602,700.00.
*(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition*.
☐ Yes ☑ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

☑ I am having 1 Defendant/Respondent served and their information is on this form below.

☐ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: ____________.
*Number*

b. First Defendant/Respondent's **primary address/information** for service:

Name: GigNet, Inc.
*First, Middle, and Last Name, or Business Name*

Registered Agent's Name *(if you are serving the Registered Agent of a business)*:

The Corporation Trust Company
*First, Middle, and Last Name*

Street Address: 1209 Orange St.
*Street, Apt #*

City, State, ZIP: Wilmington, DE 19801
*City* *State* *Zip*

Telephone: (302) 658-7581 Email: ____________________

*Case Number:* 2025 LA 444

c. **Second address** for this Defendant/Respondent:
☐ I do **not** have another address where the Defendant/Respondent might be found.
☑ I have another address where this Defendant/Respondent might be found. It is:

Street Address: 101 Waukegan Rd. Suite 650
*Street, Apt #*

City, State, ZIP: Lake Bluff, IL 60044
*City* *State* *Zip*

Telephone: (303) 898-0625 Email: emooney@gignetinc.com

d. Person who will serve your documents on this Defendant/Respondent:
☐ Sheriff in Illinois ☑ Special process server ☐ Licensed private detective
☐ Sheriff outside Illinois: ____________________
*County & State*

## PLAINTIFF/PETITIONER INFORMATION:

*Enter your information below.*

Name Angel Gonzalez
*First, Middle and Last Name*

Registered Agent's name, if any Gail S. Eisenberg, Loftus & Eisenberg, Ltd.
*First, Middle and Last Name*

Street Address 181 W Madison St #4700
*Street, Apt #*

City, State, ZIP: Chicago, IL 60602
*City* *State* *Zip*

Telephone: (312) 899-6625 Email: Gail@LoftusandEisenberg.com

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

**STOP** The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

Witness this Date: 5/30/2025

Clerk of the Court: Erin Cartwright Weinstein
JT

*Seal of Court*

CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT LAKE COUNTY ILLINOIS

**To be filled in by an officer or process server:**

Date of Service: ____________________

*Fill in the date above and give this copy of the Summons to the person served.*

**Note to officer or process server:**

- If 1 is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.
- If 2 is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.
  - If 2 is checked **and** 3b is checked yes, the *Summons* must be served at least 3 days before the court date.
- Fill in the date above and give this copy of the *Summons* to the person served.
- You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

*Case Number:* 2025 LA 444

# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.

Learn more about each step in the process and how to file in the instructions: ilcourts.info/summons-instructions.

## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

**You have been sued:**

- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons)**:

- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of on this *Summons* is checked (date certain summons):**

- You **must** attend court on the date listed in Section 2 of this *Summons.*
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**

- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

Case Number: 2025 LA 444

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1st Summons issued for this Defendant/Respondent.*

**COUNTY:** Lake
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Angel Gonzalez
*Who started the case.* *First, Middle, and Last Name or Business Name*

2025 LA 444
**Case Number**

**DEFENDANTS/RESPONDENTS:** GigNet, Inc.
*Who the case was filed against.*
______________________
______________________
*First, Middle, and Last Name or Business Name*

**STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.** Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is ______________________ and I state:
*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: ______________________
*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

\- or -

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:

☐ Male ☐ Female ☐ Non-Binary Approx. Age: ________ Race: ____________

On this date: ______________ at this time: ______________ ☐ a.m. ☐ p.m.

Address, Unit#: ______________________

City, State, ZIP: ______________________

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:

Name of person served: ______________________
*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary Approx. Age: ________ Race: ____________

On this date: ______________ at this time: ______________ ☐ a.m. ☐ p.m.

Address, Unit#: ______________________

City, State, ZIP: ______________________

and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above address on this date: ______________.

*Case Number:* 2025 LA 444

☐ On the **Business's agent:** ______________________________
*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary Approx. Age: __________ Race: _______________

On this date: _________________ at this time: _________________ ☐ a.m. ☐ p.m.

Address, Unit#: ______________________________________________

City, State, ZIP: ______________________________________________

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: ______________________ at this time: ______________ ☐ a.m. ☐ p.m.

Address, Unit#: ______________________________________________

City, State, ZIP: ______________________________________________

Other information about service attempt:

______________________________________________

______________________________________________

______________________________________________

**Second Attempt:** On this date: ____________________ at this time: ______________ ☐ a.m. ☐ p.m.

Address, Unit#: ______________________________________________

City, State, ZIP: ______________________________________________

Other information about service attempt:

______________________________________________

______________________________________________

______________________________________________

**Third Attempt:** On this date: ______________________ at this time: ______________ ☐ a.m. ☐ p.m.

Address, Unit#: ______________________________________________

City, State, ZIP: ______________________________________________

Other information about service attempt:

______________________________________________

______________________________________________

______________________________________________

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/______________________________ Print Your Name ______________________________

You are: ☐ Sheriff in Illinois ☐ Special process server

☐ Sheriff outside Illinois: _______________ ☐ Licensed private detective, license number: _____________

*County and State* *License number*

**FEES:**

Service and Return: $___________ Miles: $____________ Total: $______________

CIRCUIT COURT OF LAKE COUNTY, ILLINOIS
18 N COUNTY ST, WAUKEGAN, IL 60085

**FILED**
**6/23/2025 11:49 AM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**Angel Gonzalez**

*Plaintiff(s) / Petitioner(s)*

v.

Case No.: 2025LA00000444

**GigNet, Inc.**

*Defendant(s) / Respondent(s)*

## AFFIDAVIT OF SERVICE

I, Kimberly Mcmullin, state:

I am 18 years or older and not a party to this action or a member of a corporation or organization that is a party to this action.

I served the following documents to GigNet, Inc. in New Castle County, DE on June 11, 2025 at 9:38 am at 1209 Orange St., Wilmington, DE 19801 by leaving the following documents with Chimere Brooks who as Intake Specialist at The Corporation Trust Company is authorized by appointment or by law to receive service of process for GigNet, Inc..

Proof Of Service Of Summons
Complaint; Notice

Black or African American Female, est. age 45-54, glasses: Y, Black hair, 180 lbs to 200 lbs, 5' 3" to 5' 6".
Geolocation of Serve: https://google.com/maps?q=39.7482616667,-75.5475466667
Photograph: See Exhibit 1

Total Cost: $120.00

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

Executed in
Philadelphia County,
PA on 6/12/2025.

/s/ Kimberly Mcmullin
Signature
Kimberly Mcmullin
+1 (484) 319-1715

# Group Exhibit A



Group Exhibit A

